THE HONORABLE JOHN C. COUGHENOUR

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| TRISTAN COOMES and SEAN COOMES,<br><br>        Plaintiffs,<br><br>    v.<br><br>EDMONDS SCHOOL DISTRICT NO. 15, et al.,<br><br>        Defendants. | CASE NO. C12-0319-JCC<br><br>ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |

This matter comes before the Court on Defendants' motion for summary judgment (Dkt. No. 44). Having thoroughly considered the parties' briefing and the relevant record, the Court finds oral argument unnecessary and hereby GRANTS the motion for the reasons explained herein.

I.    BACKGROUND

Plaintiff Tristan Coomes ("Coomes") claims that the Edmonds School District ("District") and the principal and assistant principal of the school at which she taught retaliated against her after she engaged in speech protected by the First Amendment and constructively discharged her in violation of public policy. Plaintiff Sean Coomes's claims are derivative of Tristan Coomes's claims.

Coomes worked for four years at Meadowdale Middle School ("MMS") as a teacher for

students with Emotional/Behavioral Disorders ("EBD"). As the EBD teacher at MMS, Coomes's responsibilities included developing EBD students' Individualized Education Programs (IEPs),[1] providing specialized instruction, including behavior instruction, to EBD students in a "self-contained" EBD classroom, and attending to the "physical and safety needs" of EBD students. (Dkt. No. 45-1.) Coomes asserts that during her first few years at MMS, she got along with the administration and "things went well" for her and her students. (Dkt. No. 55 at ¶ 7.)

Each of Coomes's annual performance evaluations were completed by Defendant Joe Webster, the Assistant Principal of MMS. She received an unqualified positive evaluation for the 2007-2008 school year. (Dkt. No. 45-2.) Her 2008-2009 evaluation ranked her "satisfactory"—the highest option available—in all areas and in overall performance but did note the need to continue to develop the academic aspects of her program. (Dkt. No. 45-3.) Coomes's 2009-2010 evaluation, completed in May 2010, also ranked her "satisfactory" in all areas and in overall performance. (Dkt. No. 45-4 at 2.) The evaluation again noted the need to continue developing the academic aspects of her curriculum and to apply objective evaluation techniques. (*Id.* at 3–4.)

Coomes's relationship with Webster and Defendant Christine Avery, the Principal of MMS, deteriorated in 2010 and 2011. On March 26, 2010, Coomes sent to Andi Nofziger, her union representative, and Debby Carter, a District human resources manager, a letter stating that she believed Avery created a "hostile work environment" at MMS by targeting teachers who openly disagreed with administrative decisions. (Dkt. No. 45-15 at 2.) Coomes implied that she had become a target of hostility because she expressed concerns that EBD students who were ready to move to mainstream classes were not moved or had moves delayed based on financial

---

[1] State and federal law require an IEP for every student eligible for special education. *See* Wash. Admin. Code § 392-172A-03090. A student's IEP must be developed by an "IEP team" that includes teachers, school officials and the student's parent(s) or guardian(s). Wash. Admin. Code § 392-172A-03095.

considerations. (*Id.* at 3.) Coomes forwarded an email containing the letter and Nofziger's response to a group of other MMS teachers at their personal email addresses. (Dkt. No. 54-8 at 4.)

A longer email trail, including Coomes's letter, was forwarded to Avery on April 7, 2010. (*Id.* at 2–3.) Avery forwarded the email trail to District administrators, stating that it contained false accusations and that she hoped the District would "take a very strong position in stopping this behavior." (Dkt. No. 54-8 at 2.) She added: "I am borderline feeling harassed in my own workplace, as well as these words feel slanderous." (*Id.*) A few weeks later, Avery emailed Carter and Assistant Superintendent Ken Limon to express her disagreement with a proposal to reassign Coomes to another school. (Dkt. No. 54-11 at 2.) Avery wrote: "In the absence of concrete examples of my mistreatment toward [Coomes] or concrete examples of creating a hostile work environment for [Coomes], I believe [Coomes] should be maintained in her current position." (*Id.*) Avery explained that moving Coomes would be unfair to her because it would appear to validate Coomes's complaints and would be unfair to the new principal who would inherit a "troubled employee." (*Id.*) Also in April 2010, Avery sent Limon an email stating "Again, we do not need an EBD program!" and, "Our idea of a program is to put the most mentally ill students together in a room all day with untrained professionals to work with and/or improve their mental health status." (Dkt. No. 54-14 at 2.)

At the start of the 2010-2011 school year, EBD students were placed in more "mainstream" academic classes than in past years as part of "a concerted effort to move the EBD program from a self-contained model to a more inclusive model." (Dkt. No. 47 at ¶ 13.) Coomes had objected to this change when it was proposed in the spring of 2010 because "it was a blanket change applied to the program as a whole and not based upon each student's individual needs." (Dkt. No. 55 at ¶ 13.) She sent Webster an email on June 7, 2010, stating that she thought that new students who had been in self-contained classrooms for sixth grade should start the year in her EBD classroom full time so she could get to know their needs and help them adjust to the

new school setting. (Dkt. No. 54-15.)

Coomes continued to express concerns about changes to the EBD program during the 2010-2011 school year. On September 8, 2010, she sent an email to Nofziger and Assistant Superintendant Anthony Byrd objecting to an email communication from Webster stating that the decision to place EBD students in more mainstream classes was the result of a team decision and was evidence based. (Dkt. No. 45-8 at 2.) She stated that she wanted to put her concerns on the record "before something seriously negative happens" and that the placements were inconsistent with student IEPs. (*Id.*) The next day Coomes sent an email to Nofziger and Limon stating that the research on which Webster relied to support his decision to move EBD students into more mainstream classes did not support that change to the program. She again referenced discrepancies with student IEPs and stated that MMS was not following "best practices" with respect to EBD students. (Dkt. No. 45-8 at 6.) On September 22, 2010, Coomes sent an email to Webster and the rest of the team managing the EBD program expressing concerns about a student's placement and stating that the student's guardian did not agree with the placement. (Dkt. No. 54-18 at 3.) Coomes then forwarded her message and Webster's response to Nofziger, stating that Webster's response failed to acknowledge her concerns and mischaracterized the student's feelings about the placement. (Dkt. No. 54-18 at 2.) Similarly, in October 2011 Coomes sent an email to Nofziger and Limon stating that her students were still being mishandled. (Dkt. No. 54-25 at 2.) In February 2011, Coomes sent an email to Avery and Webster "documenting" her disagreement with the placement of a particular student and stating that it was inconsistent with his IEP. (Dkt. No. 54-18 at 5–6.) She also stated that she was concerned that Webster had "put his hands on the student" without appropriate training and that the incident had not been properly documented in the student's file. (*Id.* at 6.)

Coomes's 2010-2011 evaluation ranked her "satisfactory" in four areas, "below average" in three areas, and "satisfactory" overall. (Dkt. No. 45-5.) The narrative portion of the evaluation contained many criticisms, including that teaching replacement behaviors was "done in a random

ORDER GRANTING DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT
PAGE - 4

manner without the use of a planned curriculum," that Coomes's "lessons either did not have clear goals, or the activities were not clearly linked to goals," that a "scaffolding of learning" was not evident across lessons, and that Coomes was observed "spending most of her time in the classroom at her laptop computer and giving instructions from the front of the classroom while students are expected to work independently on given tasks." (Dkt. No. 45-5 at 3–4.) In addition, Webster and Avery wrote Coomes a number of letters over the course of the 2010-2011 school year documenting concerns about her performance or reiterating their expectations regarding curriculum and the EBD program. (Dkt. Nos. 47-1, 47-2 (two letters from Avery); Dkt. No. 48-1 (eleven letters from Webster).)

Coomes was transferred to a position at nearby Lynwood High School for the 2011-2012 school year. (Dkt. No. 49-1 at 2.) Coomes collapsed at work at Lynnwood High School prior to the start of the school year. (Dkt. No. 55 at ¶ 30.) On September 6, 2011 Coomes requested medical leave from September 1 – December 31, 2011. (Dkt. No. 45-9 at 2.) That request was processed and apparently approved by the District as of September 8, 2011. (Dkt. No. 45-11 at 2–3.) On the advice of her therapist, Coomes did not return to work. (*Id.*) On September 12, 2011, Coomes's attorney sent the District a letter stating that it was "impossible for her to continue working" and that she had been constructively discharged. (Dkt. No. 45-12 at 2.) After the District's counsel contacted Coomes's counsel to confirm that Coomes would not be returning to work, the District processed her employment separation. (Dkt. No. 45 at ¶ 14; Dkt. No. 45-13 at 2.)

## II.   DISCUSSION

### A.   Summary Judgment Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue of fact is genuine if there is sufficient evidence for a reasonable jury to find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). At

the summary judgment stage, evidence must be viewed in the light most favorable to the nonmoving party, and all justifiable inferences are to be drawn in the nonmovant's favor. *Id*. at 255.

### B. Coomes's First Amendment Retaliation and Infringement Claims

A public employer may not stifle the First Amendment rights of its employees. But, the free speech rights of public employees must be balanced against "the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Bd. Of Educ.*, 391 U.S. 563, 568 (1968). The Ninth Circuit has distilled a five-step sequential inquiry for determining whether a public employer unlawfully retaliated against an employee for engaging in protected speech. The court considers:

> (1) whether the plaintiff spoke on a matter of public concern; (2) whether the plaintiff spoke as a private citizen or public employee; (3) whether the plaintiff's protected speech was a substantial or motivating factor in the adverse employment action; (4) whether the state had an adequate justification for treating the employee differently from other members of the general public; and (5) whether the state would have taken the adverse employment action even absent the protected speech.

*Eng v. Cooley*, 552 F.3d 1062, 1070 (9th Cir. 2009). "[B]ecause these are sequential steps, a plaintiff's failure to satisfy a single one necessarily concludes [the court's] inquiry." *Johnson v. Poway Unified Sch. Dist.*, 658 F.3d 954, 961–62 (9th Cir. 2011) (internal quotation marks omitted). The same five-step inquiry applies to a First Amendment infringement claim. *See id.* at 957, 964.

#### 1. Matter of Public Concern

"[T]he Plaintiff bears the burden of showing that the speech addressed an issue of public concern." *Id.* Whether the subject of speech touches upon a matter of public concern is a question of law. *Id.* at 964 (quoting *Connick v. Myers*, 461 U.S. 138, 148 n.7 (1983)). The court considers "the content, form, and context of a given statement, as revealed by the whole record" to determine whether speech "fairly can be said to relate to any matter of political, social, or

other concern to the community." *Id.* (internal quotation marks omitted). The content of the speech is the "greatest single factor" in this inquiry. *Id.* at 965. Form and context are important only "in those close cases where the subject matter of a statement is only marginally related to issues of public concern." *Id.* (internal quotation marks omitted).

The Ninth Circuit has concluded that a teacher's criticism of the management of programs for disabled children is a matter of "public importance." *Settlegoode v. Portland Pub. Sch.*, 371 F.3d 503, 514 (9th Cir. 2004). Under *Settlegoode*, Coomes's criticism of the EBD program at MMS related to a matter of public concern. Defendants appear to concede this point. (Dkt. No. 44 at 9.)

"[S]peech that deals with individual personnel disputes and grievances that would be of no relevance to the public's evaluation of the performance of governmental agencies is generally not of public concern." *Eng*, 552 F.3d at 1070 (internal quotation marks omitted). Defendants argue that Coomes's March 26, 2010 letter to her union representative and a District human resources manager contained only complaints about her work environment and did not relate to matters of public concern. In *Connick*, the Supreme Court concluded that portions of a questionnaire soliciting concerns about "confidence and trust . . . in various supervisors, the level of office morale, and the need for a grievance committee," circulated by an assistant district attorney to her co-workers, did not touch on matters of public concern. 461 U.S. at 148. The Court rejected the plaintiff's argument that the questions would be of "public import in evaluating the performance of the District Attorney as an elected official." *Id.*

Similar to the questionnaire in *Connick*, Coomes's March 26 letter relates primarily to workplace morale and staff conflicts with Avery. (Dkt. No. 45-15 at 2–3.) The letter also mentions Coomes's concern that special education students were not being moved to mainstream classes when they were ready for financial reasons. (Dkt. No. 45-15 at 3.) That single reference, used primarily as an example of a teacher being targeted for raising concerns about an administrative decision, is not sufficient to turn the letter into speech relating to a matter of

ORDER GRANTING DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT
PAGE - 7

public concern. This is particularly true because the evident purpose of the letter was to inform a union representative and District administrator about personnel grievances allegedly shared by a group of MMS teachers and staff.

The Court concludes that Coomes's various communications with MMS and District administrators discussing the EBD program at MMS relate to matters of public concern. Her March 26, 2010 letter, however, does not.

### 2. Private Citizen or Public Employee

The plaintiff also "bears the burden of showing that speech was spoken in the capacity of a private citizen and not a public employee." *Eng*, 552 F.3d at 1071. "Statements are made in the speaker's capacity as a citizen if the speaker had no official duty to make the questioned statements, or if the speech was not the product of performing the tasks the employee was paid to perform." *Id.* (internal quotation marks omitted). The court begins by making a factual determination as to the "scope and content of plaintiff's job responsibilities," bearing in mind that written job descriptions may not accurately reflect the actual duties an employee is expected to perform. *Johnson*, 658 F.3d at 966.

In *Garcetti v. Ceballos*, the Supreme Court held that a prosecutor spoke in his capacity as an employee when he wrote a memo to his supervisor recommending that a case be dismissed because the affidavit supporting a search warrant contained serious misrepresentations. 547 U.S. 410, 414–15, 421 (2006). As the Ninth Circuit has explained, if the plaintiff's speech "owes its existence to his position as a teacher, then [plaintiff] spoke as a public employee, not as a citizen, and [the court's] inquiry is at an end." *Johnson*, 658 F.3d at 966. The *Johnson* court found it was "clear" that a teacher who hung banners referring to God in his classroom spoke as an employee, not a private citizen. *Id.* at 967. The court explained that teachers "*necessarily* act as teachers for purposes of a *Pickering* inquiry when at school or a school function, in the general presence of students, in a capacity one might reasonably view as official." *Id.* at 968.

The District argues that Coomes's speech, including her communications with

supervisors and District administrators, occurred "while she was acting as a teacher." (Dkt. No. 44 at 10.) Coomes responds that her job responsibilities "did not include battling with District representatives over the special education rights of her students." (Dkt. No. 51 at 15.) According to Coomes's job description, she was responsible for providing specialized instruction to EBD students, developing IEPs and Behavior Intervention Plans, and attending to the physical and safety needs of EBD students. (Dkt. No. 45-1 at 2.) As Coomes's job description and her own testimony demonstrate, she was the teacher responsible for managing the EBD program and was part of the IEP team. (Dkt. No. 55 at ¶ 3 (Coomes declares that she was "put in charge of the EBD program" and "successfully managed" the program.).)

The Court concludes that Coomes spoke as a public employee, not as a private citizen, when she objected to changes to the EBD program. Many of Coomes' communications with MMS and District administrators were sent using her school district email account and a number were sent during school hours. (*See, e.g.*, Dkt No. 45-8 at 2, 6; Dkt. No. 54-15 at 2; Dkt. No. 54-18 at 2–6.) More importantly, Coomes was expressing her professional opinions about the appropriate management of a program in which she played a leadership role. In this respect she is similar to Ceballos, the district attorney who alleged retaliation after writing a memo to his superiors recommending that a case be dismissed. *See Ceballos*, 547 U.S. at 414–15, 421. Just as it was part of Ceballos's job to recommend dismissal of a prosecution that he did not think was warranted, it was part of Coomes's job as the IEP manager and a member of the IEP team to point out failures to abide by IEPs. *See also Freitag v. Ayers*, 468 F.3d 528, 544–46 (9th Cir. 2006) (corrections officer spoke as employee when she reported misconduct in a prison to prison officials because it was her job to do so). Similarly, it was part of Coomes's job as the EBD teacher to communicate with administrators and parents about her views on the placement and progress of EBD students and appropriate management of the EBD program. *See id.*

Although this case is not as "clear" as *Johnson* because Coomes's speech was not directed at a captive audience of students, *see* 658 F.3d at 967, the Court concludes that

Coomes's speech "owes its existence" to her position as the EBD teacher at MMS, *see id.* at 966. Coomes fails to satisfy second step in the *Pickering* inquiry set out in *Eng* because she spoke as a public employee and not a private citizen. As a result, the Court DISMISSES with prejudice her First Amendment retaliation and infringement claims.

### C. Wrongful Discharge in Violation of Public Policy

Coomes argues that Defendants' retaliation for her speech on behalf of her students made her working conditions so intolerable that she was constructively discharged in violation of the clear public policy favoring appropriate public education for EBD students.[2] Defendants argue that Coomes voluntarily resigned from her position with the District and was not constructively discharged. Alternatively, they argue that even if she was constructively discharged, there was no violation of public policy.

The elements of a cause of action for wrongful discharge in violation of public policy are: (1) the existence of a clear public policy; (2) that discouraging the conduct in which the plaintiff engaged would jeopardize the public policy; (3) that the public-policy-linked conduct caused the dismissal; and (4) that the defendant has not offered an "overriding justification for the dismissal." *Id.* at 125. The tort of wrongful discharge in violation of public policy should be "narrowly construed in order to guard against frivolous lawsuits." *Id.*; *see also Cudney v. Alsco, Inc.*, 259 P.3d 244, 246 (Wash. 2011) (the court's admonition to "proceed cautiously" applies to the jeopardy element).

There does not appear to be any dispute that Washington has a clear public policy favoring the provision of appropriate public education to EBD students. The second element of a

---

[2] Coomes's amended complaint contains a cause of action for wrongful "constructive discharge" and a second cause of action for wrongful discharge in violation of public policy. (Dkt. No. 26 at 11.) The Court considers these to be a single claim. *See Snyder v. Med. Serv. Corp.*, 35 P.3d 1158, 1161 (Wash. 2001) ("Washington law does not recognize a cause of action for constructive discharge; rather it recognizes an action for wrongful discharge which may be either express or constructive.").

wrongful discharge claim is not satisfied where "other means of protecting the public policy are adequate so that recognition of a tort claim . . . is unnecessary to protect the public policy." *Id.* at 127. "[T]he other means of promoting the public policy need not be available to the person seeking to bring the tort claim so long as the other means are adequate to safeguard the public policy." *Id.* (internal quotation marks omitted). Applying those rules, the Washington State Supreme Court concluded that a federal statute providing administrative remedies to employees who face retaliation after reporting fraud or misconduct in the nuclear industry was sufficient to promote the public policy favoring disclosure of such fraud or misconduct. *Id.* at 126–27. Similarly, in *Cudney*, the plaintiff alleged that he was fired for reporting that a supervisor had driven a company vehicle while drunk. 259 P.3d at 245. The state high court held that provisions of a statute addressing retaliation against employees who report workplace safety violations and criminal laws against drunk driving were sufficient to promote the public policies of ensuring workplace safety, protecting employees who report violations, and preventing drunk driving. *Id.* at 247–50.

      The Washington Court of Appeals, in an unpublished decision, rejected a teacher's wrongful discharge claim based on reporting alleged illegal placements of disabled students. *See Blumhoff v. Tukwila Sch. Dist. No. 406*, 2008 WL 4902630, at *2–3 (Wash. Ct. App. Nov. 17, 2008) (unpublished).[3] The court concluded that the under *Korslund*, the comprehensive state and federal regulatory schemes protecting the rights of disabled students and the state's administrative process for adjudicating whistleblower complaints were sufficient to promote the public policy favoring appropriate education for disabled students. *Id*. at *4–7. Although the Court recognizes the limited precedential value of *Blumhoff*, the Court concludes that it correctly

---

[3] Coomes's request to strike Defendants' citation to *Blumhoff* (Dkt. No. 51 at 20) is denied. Washington court rules bar citation to unpublished Washington Court of Appeals decisions, *see* Wash. General Rule 14.1. State court rules do not apply to this Court and this Court has no analogous local rule.

applied the rules set forth in *Korslund* to a factual situation nearly identical to the one presented in this case. The Court agrees with Defendants that under *Korslund*, Coomes's wrongful discharge claim fails as a matter of law because even if she was constructively discharged, her discharge did not jeopardize public policy. Coomes's wrongful discharge claim is DISMISSED with prejudice.

###    D.    Willfully Withheld Wages

Under Washington law, an employer who willfully fails to pay wages owed to an employee under any statute, ordinance or contract is liable to the employee for twice the wages due. *See* Wash. Rev. Code §§ 49.52.050(2), 49.52.070. Coomes argues that the District is liable for double damages because it has not paid her wages since it processed her separation from employment. Because Coomes's wrongful discharge claims fail, the District does not owe her any wages. Accordingly, her claim under section 49.52.070 is DISMISSED with prejudice.

###    E.    Intentional and Negligent Infliction of Emotional Distress

The elements of a claim for intentional infliction of emotional distress or outrage are: "(1) extreme and outrageous conduct, (2) intentional or reckless infliction of emotional distress, and (3) actual result to plaintiff of severe emotional distress." *Kloepfel v. Bokor*, 66 P.3d 630, 632 (Wash. 2003). A claim for intentional infliction of emotional distress must be based on behavior that is so extreme "as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* The Court agrees with Defendants that Coomes has not provided any evidence that Defendants engaged in conduct so extreme as to "go beyond all possible bounds of decency." At worst, Defendants' disagreed with Coomes's views regarding management of the EBD program and unfairly criticized her and undermined her professionally because she persisted in voicing her opinions. No reasonable juror could conclude that such conduct goes "beyond all possible bounds of decency" or is "atrocious."

A plaintiff claiming negligent infliction of emotional distress ("NIED") must prove

negligence—duty, breach, proximate cause and damage—with the additional requirement of proving damages by objective symptomatology. *Id.* at 634 (citing *Hunsley v. Giard*, 553 P.2d 1096 (Wash. 1976)). In the employment context, a plaintiff cannot bring a claim for NIED based on the employer's disciplinary acts or a personality dispute. *Chea v. Men's Wearhouse, Inc.*, 932 P.2d 1261, 1262 (Wash. Ct. App. 1997). Employers do not have a duty to "use reasonable care to avoid the inadvertent infliction of emotional distress when responding to workplace disputes." *Snyder*, 35 P.3d at 1164. Instead, employers are permitted to handle workplace disputes, even where their actions are stressful to impacted employees. *Id.* at 1165. "[T]he courts cannot guarantee a stress-free workplace." *Id.*

The Court has carefully considered Coomes's allegations of bullying and harassment by Webster and Avery. Viewing those allegations in the light most favorable to Coomes, no reasonable juror could conclude that Webster and Avery did anything but critique Coomes's performance and set forth expectations for future performance. That Coomes may have thought these criticisms were unjustified, or may have found the manner in which they were delivered to be stressful, does not create a cognizable legal claim under Washington law. *See Snyder*, 35 P.3d at 1161, 1165 (employee who alleged that supervisor had threatened to "kill her," mocked her in front of other employees, and poked her in the chest while accusing her of being insubordinate did not overcome employer's defense that the claim "encompassed a workplace dispute or personality difference.").

### III.   CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment (Dkt. No. 44) is GRANTED. The Court DISMISSES with prejudice Plaintiffs' claims.

//

//

//

//

1     DATED this 28th day of June 2013.

 

John C. Coughenour
UNITED STATES DISTRICT JUDGE